**Electronically Filed
Intermediate Court of Appeals
CAAP-25-0000077
31-JUL-2026
08:01 AM
Dkt. 66 SO**

NO. CAAP-25-0000077

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

ANAYA GONDA, Petitioner-Appellee,
v.
MARK DUERING, Respondent-Appellant.

APPEAL FROM THE DISTRICT COURT OF THE FIRST CIRCUIT
HONOLULU DIVISION
(CASE NO. 1DSS-24-0001484)

SUMMARY DISPOSITION ORDER
(By: Leonard, Presiding Judge, Hiraoka and Gluck, JJ.)

Self-represented Respondent-Appellant Mark Duering appeals from the January 15, 2025 Injunction Against Harassment (**Injunction**) issued by the District Court of the First Circuit, Honolulu Division (**District Court**).[1] Duering argues that the District Court erred in granting the Injunction. Upon careful review of the record and the briefs submitted, and having given due consideration to the arguments advanced and the issues raised, we resolve Duering's contentions as follows, and affirm.

The background facts are these: on December 11, 2024, Petitioner-Appellee Anaya Gonda filed a Petition for an Ex Parte Temporary Restraining Order (**TRO**) and for Injunction Against Harassment (**Petition**). Gonda alleged that Duering, her former

---

[1] The Honorable Bryant Zane presided.

landlord, had harassed her both before and after she vacated the apartment on September 11, 2023. She alleged that Duering sent her "over 25 disturbing text messages with no legitimate purpose and a concerning focus on [her] health," reflecting Duering's belief that COVID vaccines had caused Gonda's health problems. She alleged that Duering continued to send her text messages in October 2023, January 2024, April 2024, July 2024, and November 2024.

The District Court held a trial on Gonda's Petition on three separate days (December 24 and 31, 2024 and January 15, 2025). Gonda's boyfriend, Gustavo D'Amico, was the first witness. He testified that he and Gonda arrived at the apartment on September 11, 2023 to find Duering there with a painter — even though Gonda had paid rent through the end of September — and that Duering began "screaming at" D'Amico. D'Amico called the police, and the police "helped handle the situation."

Gonda then testified that, on September 11, 2023, she told Duering not to contact her:

BY THE COURT:

    Q    When -- did you ever at any point in time explicitly tell Mr. Gering [sic] you are not to text or communicate with me?

    A    Yes, multiple –

    Q    When was that?

    . . . .

    Did you tell him explicitly not to contact you?

    A    Yes.

    Q    Okay. Was the first time on September 11th or was that the police telling him?

    A    Both.

    Q    How did you tell him?

    A    I told him verbally, very explicitly --

    Q    Wait, wait, wait.

```
A       -- to --

Q       When you say -- just say how you told him.

A       Oh.  Like I told him never contact me again.  I
in -- have no business with you.  I don't want any further
communication with you unless it's through my lawyer.
```

She similarly testified that "after my tenancy ended on September 11th and I, uh -- told Mr. Duering to never contact me again, except via my lawyer . . . ."  Gonda testified that this exchange took place in person:

```
A       Uh, the last -- the last thing I wanna testify
to is the instances in person as well, when, uh --

Q       Okay.

A       -- Mr. Duering was -- was threatening --

Q       Yeah.

A       -- me.

Q       When was in-person?

A       In person was on September 11th, 2023, --

Q       Uh-huh.

A       -- in my apartment, when, uh – when eventually
my boyfriend called 911.

Q       Yeah.  What did he do to you?

A       Uh --

Q       Mr. Duering?

A       Mr. Duering refused to leave and yelled at us
to get out.  He was very intimidating, and --

Q       What was in -- so try not to use --

A       He was -- he was --

Q       -- conclusory -- try not to use
conclusory terms like intimidate.  Tell me what he did.

A       He -- he yelled at us to get out, said that we
were trespassing, uh -- said that, um -- that he was -- he
was justified in kicking my friend out of the apartment
that morning and taking his keys.

Um -- and -- and there were painters in the
apartment, um -- he -- when he -- when -- he brought
painters with him and they were painting the walls when I
arrived back home.
```

Um -- at that point, when the police officers arrive, I -- I had kept on repeating to him that I needed to either get the keys or a refund for rent. Uh, and once officers arrived, they reviewed the lease and, uh -- assisted under police supervision, um -- in -- in getting Mr. Duering to give me a check, and that -- that was the end of, uh -- my stay in that apartment.

I told him to never contact me again except via my lawyer. Uh, also, while police were there, and he -- he disregarded that.

Um -- we also got a verbal warning from police not to, uh -- or to only contact from each -- only contact each other, uh -- with written communication only. And yet he called me, he attempted to call me.

Q      That day?

A      That day.

Q      Okay.

A      Within a few hours.

Duering, for his part, denied that Gonda told him not to communicate with her.

Gonda testified that Duering continued to send her text messages, specifically in October 2023, January 2024, April 2024, July 2024, and November 2024. She testified that she cashed the check from Duering (returning her security deposit) in March 2024, and therefore had no business with him after that date. Gonda testified that Duering's text messages were "always about [her] health" and contained "COVID vaccine . . . conspiracy theories." She testified that there was no reason for Duering to communicate with her. In cross-examination by Duering, Gonda further testified that she was "concerned and disturbed by the obsessive nature of [his] continued messages towards [her] when there's absolutely no reason for [him] to contact [her]."

Hawaiʻi Revised Statutes (**HRS**) § 604-10.5(a) defines "Harassment" as including:

An intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual and serves no legitimate purpose; provided that the course of conduct

4

would cause a reasonable person to suffer emotional
distress.

The statute defines "Course of conduct" as "a pattern of conduct
composed of a series of acts over any period of time evidencing
a continuity of purpose."  Id.

The District Court granted the Injunction for three
years, finding that Duering harassed Gonda within the meaning of
HRS § 604-10.5.  The District Court explained its findings:

> Okay.  So for the most part, the evidence is not in
> dispute.  Mr. Duering admits he sent communication to Ms.
> Gonda.
>
> I think the one key fact that was not admitted was --
> was that Ms. Gonda did unequivocally tell Mr. Duering that
> she didn't want to have communication with him directly and
> that any communication would only have to be about the
> apartment in writing to her attorney.
>
> The court will find that Ms. Gonda did say that to
> Mr. Duering and Mr. Duering was on notice that any
> communication, further communication outside of those
> exceptions were unwanted.
>
> . . . .
>
> The -- apparently, there had been some
> dissatisfaction with the apartment, um -- and that was
> causing conflict between Mr. Duering and Ms. Gonda, and
> -- and it came to a head on September 11th.
>
> I am finding that Ms. Gonda did tell Mr. Duering in
> no uncertain terms that further contact directly with her
> was unwanted, and that any contact, any communication
> needed to be made to her attorney in writing and should be
> only about matters dealing with the apartment.
>
> Now, I think it -- the security deposit did not get
> resolved until March of 2024.  But after that, there was a
> number of communications made.  April 1st, saying that Mr.
> -- texting that Mr. Duering wanted to be friends.  April
> 5th, a video, about his beliefs regarding COVID.  There
> were further communica – texts on April 9th, April 12th
> . . . .  A further communication on April 26th . . . .
> Another communication on July 16th, and a text on
> November 22nd, 2024.
>
> The court is -- finds by clear and convincing
> evidence it has been proven, harassment has been proven,
> that Mr. Duering did in fact harass Ms. Gonda by sending
> her text.  And the court will find that Mr. -- Mr. Duering
> intentionally or knowingly sent the communication to Ms.
> Gonda and that -- and that Ms. Gonda was seriously alarmed,
> was disturbed consistently, was continually bothered by Mr.
> Duering's further communication, and that -- the court also
> finds that it served no legitimate purpose.

5

And that's within the context of the relationship that there was no longer a landlord/tenant relationship. That Ms. Gonda -- there was no friendship between Mr. Duering and Ms. Gonda. That Mr. Duering was not -- is not her doctor.

This information was unsolicited and it was also unwanted. It was made clear that it was unwanted. And within that context it served no legitimate purpose.

And I am finding that a reasonable person, so objectively, would suffer emotional distress under the circumstances as it was made clear to the court.

Duering raises four points of error. We address each in turn.

**1) Improper use of false testimony from closing argument.** Duering argues that the District Court improperly solicited testimony from Gonda during closing argument and that, by doing so, the District Court was a witness rather than a neutral arbiter. Duering argues that the District Court relied on "extra record" evidence and that doing so violated Duering's right to due process.

Duering is correct that, during closing argument, the District Court asked Gonda about her communication with Duering on September 11, 2023:

BY MS. GONDA: . . . .

. . . I was under the impression that I made it very clear that I never wanted to see or hear from him --

THE COURT: Okay.

MS. GONDA: -- ever again.

THE COURT: Let me --

MS. GONDA: So --

THE COURT: -- stop you there. Where in the evidence did you make that clear? Is it on September 11th, 2023, at the apartment when you were both there, you told Mr. Duering to his face?

MS. GONDA: Yes, Your Honor.

THE COURT: That you do not want him to communicate with you, except in writing. So you gave an exception, right? Except in writing to your attorney.

6

MS. GONDA: Yes, Your Honor.

THE COURT: About the apartment.

MS. GONDA: Correct.

THE COURT: So those were the qualifications?

MS. GONDA: Yes, that, uh -- the --

THE COURT: You said it --

MS. GONDA: -- only way --

THE COURT: -- to his face?

MS. GONDA: Correct, Your Honor.

THE COURT: Okay.  And you can -- you can continue.

However, there was no new evidence submitted in closing argument — Gonda simply reiterated her testimony from earlier in the trial that she had told Duering, in person, not to contact her except through her attorney.  Duering has not presented any evidence to suggest that the District Court relied on any evidence submitted during closing argument, let alone evidence that is outside the record.  Judges are, of course, free to question witnesses themselves.  See Hawaiʻi Rules of Evidence Rule 614(b) ("Interrogation by court. The court may interrogate witnesses, whether called by itself or by a party.").  Duering cites to no source of law suggesting that, in closing argument, the District Court is prohibited from asking litigants to point to evidence in the record to support their position.

Duering had an opportunity to present his evidence, to cross-examine witnesses, and to make his arguments.  There is nothing in the record to suggest that the District Court relied on evidence outside the record or from closing argument.  Duering has not presented a cognizable argument that he was denied due process.

**2)  Violation of right to free speech.**  Duering next argues that the District Court violated his right to free speech, freedom of religion, and/or to petition the government

for redress of grievances — as guaranteed by the First Amendment to the United States Constitution — by prohibiting Duering from communicating with Gonda. We disagree.

We review the District Court's order <u>de novo</u> for alleged constitutional violations. "Whether speech is protected by the first amendment to the United States Constitution, as applied to the states through the due process clause of the fourteenth amendment, is a question of law which is freely reviewable on appeal." <u>In re Doe</u>, 76 Hawaiʻi 85, 88, 869 P.2d 1304, 1307 (1994).

There was no error here. As the United States Supreme Court has made clear, "no one has a right to press even 'good' ideas on an unwilling recipient." <u>Rowan v. U.S. Post Off. Dep't</u>, 397 U.S. 728, 738 (1970). Duering has a constitutional right to hold, and publicly express, whatever views he likes regarding the COVID vaccine; here, however, Duering is not being restrained because of his viewpoints on COVID, nor is he being restricted in communicating with any other member of the public regarding his views. Instead, he is restrained from very specific <u>conduct</u> — contacting Gonda — for a limited time. This comports with the First Amendment, under which courts have recognized several categories of speech that are not protected. For example, fighting words are not protected speech. <u>See</u> <u>Chaplinsky v. State of New Hampshire</u>, 315 U.S. 568, 571-72 (1942) ("[T]he right of free speech is not absolute at all times and under all circumstances . . . . 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.'" (quoting <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 309-10 (1940))). Other categories of speech that are not protected by the First Amendment include obscenity, incitement, "communication more likely to deceive than to inform[,]" and "commercial speech relating to illegal activity[.]" <u>State v.</u>

Bloss, 64 Haw. 148, 157, 637 P.2d 1117, 1124 n. 8 (1981) (citations omitted).

The Injunction is limited and it is constitutionally permissible:  the Injunction imposes no restrictions on Duering's ability to express his views to any other member of the public (or the government), and its prohibitions with respect to Gonda expire after three years.  See State v. Calaycay, 145 Hawai'i 186, 203, 449 P.3d 1184, 1201 (2019) ("Harassment statutes that criminalize 'offensively coarse' communications and contain a specific intent requirement generally withstand facial overbreadth challenges where they contain other limiting restrictions.").  The District Court found that Duering harassed Gonda, and did not err in restraining him from harassing her further.

**3)  Improper weight of Gonda's testimony**.  Duering's third point of error seems to be that there was insufficient proof that Gonda informed Duering that Duering should cease communicating with her.  Once again, the District Court did not err.

"Whether there was substantial evidence to support an injunction against an alleged harasser is reviewed under the clearly erroneous standard." Duarte v. Young, 134 Hawai'i 459, 462, 342 P.3d 878, 881 (App. 2014) (citation and internal quotation signals omitted).  Additionally, HRS § 604-10.5(g) requires that the clear and convincing standard of proof be applied in determining whether conduct rises to the level of "harassment."  We therefore apply the clearly erroneous standard as follows:

> When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved

9

conflicts in the evidence, and drawn reasonable inferences from the evidence.

In re JK, 149 Hawai'i 400, 409-10, 491 P.3d 1179, 1188-89 (App. 2021) (quoting Conservatorship of O.B., 470 P.3d 41, 55 (Cal. 2020)).  Based on the evidence presented — including Gonda's testimony — the District Court expressly found "that Ms. Gonda did tell Mr. Duering in no uncertain terms that further contact directly with her was unwanted, and that any contact, any communication needed to be made to her attorney in writing and should be only about matters dealing with the apartment."  The record contains substantial evidence — specifically, Gonda's testimony — from which the District Court could reasonably have found it highly probable that this fact was true.  The District Court did not clearly err.  See In re JK, 149 Hawai'i at 409-10, 491 P.3d at 1188-89; see also State v. Jenkins, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000) ("It is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." (cleaned up)).

4)  **Bias by District Court.**  Duering's fourth point of error is that the District Court was improperly biased against Duering because of Duering's views on COVID vaccines.  He points to the District Court's statement that Duering "was not -- is not [Gonda's] doctor" as evidence of the District Court's bias against him.  He explains:

> Duering's personal and religious views that the Covid vaccines were (and are) dangerous to human health; which if contrary to Judge's belief, is an issue that has divided families and friends to disassociate with one another, which was caused since the massive Covid vaccination rollout in 2021, which was in addition to the big divide, which media propagated mind control, to influence otherwise sound-minded intelligent people, to ridicule and berate people like Duering, who merely seeks to educate those who are uneducated on the subject and dangers of inviting foreign unidentified substances, to be voluntarily injected into their sacred body.

10

The District Court made its statement that Duering was not Gonda's doctor while explaining its finding that Duering had no legitimate purpose for contacting Gonda; indeed, the District Court made clear that Duering's views on COVID vaccines were not relevant to its determination:

> The point is not that your views are legitimate or substantiated or worthy of -- or worthy of Ms. Gonda to consider them.  That's really not relevant.
>
> What is relevant is somebody who did not want to have communication from you, and that being the case, it -- it almost doesn't matter what you were saying to her in that regard, and it's -- and so that's why the court is ruling that the injunction order will be issued.

Duering and Gonda no longer had a landlord-tenant relationship, and Gonda made clear that she did not want his unsolicited medical advice.  The District Court did not err in concluding that Duering had no legitimate purpose in contacting Gonda.  Nothing in the record suggests any improper bias by the District Court.

**5)  Duering's remaining arguments.**  Construing Duering's Opening Brief liberally, we can discern two other arguments.  See Makila Land Co., LLC v. Kapu, 152 Hawaiʻi 112, 120, 522 P.3d 259, 267 (2022) ("Pleadings prepared by pro se litigants should be interpreted liberally, and Hawaiʻi courts and agencies should not construe pro se filings in a manner that leads to a decision that does not promote access to justice.").  Neither has merit.

First, Duering cites to Luat v. Cacho, 92 Hawaiʻi 330, 991 P.2d 840 (App. 1999), arguing that Gonda did not prove a continuing course of conduct by clear and convincing evidence because his texts were "sporadic."  We disagree.  As this court held in Luat:

> Based on the language and legislative history of HRS § 604-10.5, we conclude that the type of harassment that the courts are mandated to restrain or enjoin under paragraph (2) involves an intentional or knowing pattern of conduct composed of a series of acts over any period of time and evidencing a continuity of purpose that is not legitimate, and is directed at, seriously alarms, disturbs

> consistently, or continually bothers an individual and would cause a reasonable person to suffer emotional distress. It is conduct that involves systematic and continuous intimidation that stops short of assault or threats and cannot be controlled effectively by resort to criminal processes and penalties.

92 Hawaiʻi at 342, 991 P.2d at 852. The District Court received evidence that Duering sent Gonda multiple text messages in 2024, after the issue of the security deposit had been resolved. This satisfies HRS § 604-10.5's requirement that there be a "series of acts over any period of time." There is substantial evidence from which the District Court could reasonably have found it highly probable that Duering engaged in a continuing course of conduct. The District Court did not err.

Second, Duering argues that the District Court improperly imported "stalking" concepts from a criminal statute. There is no support in the record for this assertion: the District Court used the correct legal framework under HRS § 604-10.5, and there was substantial evidence to support its findings.

Based on the foregoing, we affirm the January 15, 2025 Injunction Against Harassment.

DATED: Honolulu, Hawaiʻi, July 31, 2026.

On the brief:

Mark Duering,
Respondent-Appellant.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Daniel M. Gluck
Associate Judge